UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ALEXANDER NAM RIOFTA,

                  Petitioner,

    v.

DAN PACHOLKE,

                  Respondent.

No. C07-5489 BHS/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  December 16, 2011**

      Petitioner Alexander Nam Riofta was convicted in 2001 in Pierce County Superior Court of first-degree assault while armed with a firearm.  He filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 with this Court on December 3, 2007.  ECF No. 5.  Respondent filed an answer to the petition and submitted the relevant state-court record on January 24, 2008.  ECF Nos. 17 & 18.  Mr. Riofta's reply was limited to a discussion of exhaustion and requests for discovery and an evidentiary hearing.  ECF No. 26.

      The case was ordered stayed while Mr. Riofta's appeal of the denial of DNA testing was pending in the Washington Supreme Court and later, while he pursued DNA testing of the white hat found at the crime scene.  This Court subsequently vacated the stay of proceedings and directed Mr. Riofta to brief the merits of his habeas claims.  ECF Nos. 44 and 45.

      Mr. Riofta filed a supplemental reply memorandum.  ECF No. 46.  Mr. Riofta is no longer advancing his ineffective assistance of counsel claim relating to the failure to obtain pretrial DNA testing nor is he challenging the state courts' denial of his motion for post-trial

DNA testing.  *Id.* at 2.  Respondent concedes that Mr. Riofta fairly presented and exhausted his remaining claims.  ECF No. 17 at 6.

## BACKGROUND

Petitioner Alexander Nam Riofta is in Washington state custody and is confined at the Stafford Creek Corrections Center in Aberdeen, Washington.  Mr. Riofta was convicted by jury verdict of one count of assault in the first degree.  On December 14, 2001, the state trial court (the Honorable James R. Orlando) sentenced Mr. Riofta to prison for 130 months.  ECF No. 18, Exh. 1.

### A.    Factual Background

The Court relies on the factual summary of Mr. Riofta's case as set forth by the Washington Court of Appeals:

As teenagers, Ratthana Sok and Riofta played basketball at a local park. They were acquaintances rather than friends, but Sok knew Riofta as "Alex."[1] [Report of Proceedings (RP) at 220]

Around 6:40 A.M. on January 27, 2000, Sok left home to go to school.  As he opened his garage door, he noticed a Honda Civic parked nearby.  A male from the Honda approached, and Sok recognized him as Alex.  Alex came within two or three feet, asked for a cigarette, then pulled a chrome revolver.  He pointed the revolver at Sok's head and fired several times.  He missed, and Sok fled into his house.

Officer Keen arrived within five minutes.  Sok told him the shooter "looked like Alex."  Sok described Alex as five foot two, 125-130 pounds, 17-18 years old, wearing a white cap.  Keen observed two bullet holes around the garage door and three more in vehicles in the garage.  Keen also found a white baseball hat on the sidewalk.

Sok's mother told Keen that Sok's brother, Veasna, was a defendant in a case in which five people had been shot to death at the Trang Dai café.  Veasna had agreed to testify for the State against a number of defendants, including Jimmie Chea, John Phet, and Sarun Ngeth.  Jimmie Chea's nickname was "Cricket."

REPORT AND RECOMMENDATION - 2

Keen notified the lead detective in the Trang Dai case, Detective Davidson, who soon arrived and spoke with Sok. Sok said that "the person that shot at him was someone he knew by the name of Alex."[2] [RP at 246] Sok said Alex was "a Cambodian male, 17 to 18 years of age, five-two to five-three, 125 to 130 pounds, with a shaved head and a moustache."[3] [RP at 246]

Davidson and Sok went to the police station, where Davidson used a computer program to select pictures of possible perpetrators. Searching first for Asian males with the name "Alex," he came up with pictures of several men, none of whom Sok identified. Searching next for Asian males with the name "Alexander," he came up with seven more men, one of whom was Riofta. When Sok saw Riofta's picture, he said, "That's him right there, I'm positive."[4] [RP at 249]

The next day, Davidson went to Riofta's house and arrested him. During the arrest, Riofta yelled angrily, "I didn't shoot no mother fucker yesterday. I was here drinking all night. I worked yesterday from – at The News Tribune from 1:00 to 5:30. I don't even own no gun, how could I shoot some mother fucker?"[5] [RP at 251]

At the police station, Riofta made several more statements to Davidson. He said, "If I had shot at someone, I would kill them. I am not stupid enough to get identified."[6] [RP at 254] He admitted knowing Chea and Ngeth, two of the Trang Dai defendants. He admitted visiting the Sok residence on a previous occasion to see Veasna. He manifested hostility toward Veasna, stating the "Veasna was a sucker for snitching on the Homeys, and that he deserved to get choked up in court for snitching on Cricket."[7] [RP at 255. Veasna had recently been assaulted in the courtroom by Chea and Phet.] He said that he used to "hang out with [Ngeth], but that he quit hanging out with him because he had a reputation for shooting people."[8] [RP at 256] He said he had a newspaper article about all the "Homeys"[9] [RP at 257], and the police later found that article at his residence.

On January 31, 2000, Riofta was charged with first degree assault with a firearm. He retained the Law Offices of Monte Hester (specifically, attorneys Brett Purtzer and Lance Hester) and was arraigned the same day.

…

On November 28 trial began. Sok identified Riofta as the shooter. Riofta called himself, his mother, and his sister's boyfriend. On November 30, 2000, the jury found Riofta guilty of first-degree assault while armed with a deadly weapon.

ECF No. 18, Exh. 8 at 1-4, 6.

**B.    State Court Procedural History**

**1.    Direct Appeal**

Mr. Riofta appealed his conviction to the Washington Court of Appeals.  The conviction was affirmed in an unpublished opinion.  ECF No. 18, Exh. 8.  Mr. Riofta sought discretionary review by the Washington Supreme Court.  *Id.*, Exh. 9.  On May 4, 2004, the Washington Supreme Court denied review without comment.  *Id.*, Exh. 10.  The Court of Appeals' mandate issued on May 10, 2004.  *Id.*, Exh. 11.

**2.    Personal Restraint Petition and Post-Conviction DNA Proceeding**

On April 22, 2005, Mr. Riofta through counsel filed a motion for post-conviction DNA testing with the Pierce County Superior Court pursuant to RCW 10.73.170.  ECF No. 18, Exh. 13.  Mr. Riofta asked that the trial court order DNA testing of the white hat worn by the shooter.  *Id.*  After conducting a hearing, the trial court denied the motion in an oral ruling on June 10, 2005 and a written order issued on September 2, 2005.  *Id.*; Exh. 12 (transcript of hearing) at 15.  Mr. Riofta appealed the trial court's denial.  *Id.*, Exh. 18.

Shortly after the DNA testing motion was filed with the superior court, Mr. Riofta through counsel filed a personal restraint petition with the Washington Court of Appeals, which the appellate court later ordered consolidated with the post-conviction DNA appeal.  ECF No. 18, Exhs. 14 and 15.

On August 22, 2006, a unanimous three-judge panel of the Court of Appeals issued a published opinion affirming the trial court's denial of the motion for post-conviction DNA testing and denying the personal restraint petition.  *Id.*, Exh. 21; *State v. Riofta*, 134 Wn. App. 669, 142 P.3d 193 (2006).

REPORT AND RECOMMENDATION - 4

Mr. Riofta filed a motion for discretionary review with the Washington Supreme Court. *Id.*, Exh. 22. The motion argued that, with respect to the post-conviction DNA appeal, the Court of Appeals misconstrued and misapplied the provisions of RCW 10.73.170. *Id.* at 8-18 (arguments 1 and 2). With respect to the personal restraint petition, the motion argued that Mr. Riofta was entitled to discovery or a reference hearing on his claims of ineffective assistance. *Id.* at 18-19 (argument 3).

On September 5, 2007, the Washington Supreme Court granted discretionary review limited to the RCW 10.73.170 interpretation issues. The parties filed supplemental briefs, *id.,* Exhs. 22 and 23, and presented oral argument to the court on October 23, 2007. On June 11, 2009, the Washington Supreme Court issued its opinion in *State v. Riofta,* 166 Wash.2d 358, 209 P.3d 467 (Wash. 2009). ECF No. 28, Exh. 1. It held that Mr. Riofta's request for post-conviction DNA testing of the white hat was "not precluded by the procedural requirements of the statute on the basis that it could have been but was not, tested prior to trial. Exh. 1 at 8 (166 Wash.2d at 366). However, it denied Mr. Riofta relief, holding that "the trial court did not abuse its discretion in concluding the probative value of the DNA test results Riofta seeks would raise the likelihood that he could demonstrate his innocence on a more probable than not basis." Exh. 1 at 16-17 (166 Wash.2d at 373). The Court ruled that a RCW 10.73.170 inquiry "properly focuses on a petitioner's innocence" rather than on an assessment of whether a petitioner's trial was fair. Exh. 1 at 11, n.4 (166 Wash.2d at 369, n.4) ("RCW 10.73.170 is not aimed at ensuring a defendant had a fair trial. Its purpose is to provide a remedy for those who were wrongly convicted <u>despite</u> receiving a fair trial.").

On June 30, 2009, Mr. Riofta filed a motion for reconsideration with the Washington Supreme Court. ECF No. 28 at 4. On July 8, 2009, Mr. Riofta filed a Motion to Accept

Additional Evidence on Review under Wash. R. App. P. 9.11. *Id.*, Exh. 3. Thereafter, the State agreed to allow post-conviction DNA testing at the defense's expense. ECF No. 29-2.

**C.     Federal Court Procedural History**

After presenting oral arguments before the Washington Supreme Court in October 23, 2007, but before that court rendered its decision, Mr. Riofta filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 with this Court on December 3, 2007 (ECF No. 5), and a motion to stay the habeas proceedings pending the Washington Supreme Court's decision in his appeal from the denial of a post-conviction DNA motion. ECF No. 13. On March 18, 2008 this Court granted the motion to stay the habeas proceeding, noting that the Washington Supreme Court's decision could ultimately impact the analysis of the federal habeas claims and the Court was reluctant to move forward in the federal matter when the state court had not issued its final decision. ECF No. 27. In that same order the Court denied Mr. Riofta's motion for discovery as moot. *Id.*

After the Washington Supreme Court issued its decision in Mr. Riofta's post-conviction DNA proceeding on June 11, 2009 (*State v. Riofta*, 166 Wn.2d 358, 209 P.3d 467 (2009)), the parties agreed to leave the Court's stay order temporarily in place because Mr. Riofta and the state prosecutor, despite the Supreme Court's ruling, reached an agreement regarding DNA testing of the white hat. ECF No. 29. This Court therefore maintained the order for a stay pending the results of the DNA testing and issuance of the expert's report. ECF No. 33.

Two rounds of DNA testing of the white hat were performed, first by the Washington State Patrol Crime Laboratory, followed by NMS Laboratory. On September 3, 2010, Mr. Riofta filed a motion for discovery with this Court for further DNA testing of some apparent hairs

REPORT AND RECOMMENDATION - 6

found on the hat and a motion to continue the stay of proceedings. ECF Nos. 36 & 37. Mr. Riofta again argued that the results of further DNA testing would have a direct bearing on his habeas claim that counsel was ineffective for failing to request pretrial DNA testing. *See* ECF No. 36 at 3-5, 8-9. Respondent opposed both motions. ECF Nos. 38 and 39. On November 3, 2010, the Court granted the motion and maintained the order for a stay. ECF No. 41.

In April 2011, the United States Supreme Court decided *Cullen v. Pinholster,* 131 S. Ct. 1388 (2011), holding that review under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court. Moreover, the post-conviction DNA testing performed by agreement of the parties did not yield results that could exclude Mr. Riofta. As noted above, Mr. Riofta is no longer advancing arguments related to the failure of his trial counsel to seek DNA testing or relating to the state court's refusal to grant DNA testing. ECF No. 5, p. 15-16 (Ground Two ¶ A.3); pp. 20-21 (Ground Five); pp. 21-22 (Ground Six).

## FEDERAL HABEAS GROUNDS FOR REVIEW

Mr. Riofta presents the following grounds for federal habeas relief:

1)    Violation of Sixth Amendment right to retain counsel of choice when trial court disqualified his retained counsel, despite no actual or potential conflict.

2)    Violation of Sixth Amendment right to effective assistance of counsel when counsel (i) failed to notify the court of Mr. Riofta's substantial mental health issues, and (ii) failed to fully cross-examine the eyewitness and failed to obtain an expert psychological evaluation to assist with cross-examination and direct testimony.

3)    Violation of Fifth Amendment right to due process because eyewitness identification that formed the basis of conviction was an overly suggestive identification procedure.

REPORT AND RECOMMENDATION - 7

4)  Violation of substantive due process right to competence and procedural due process right to a hearing because there were substantial questions about Mr. Riofta's competency.

ECF No. 5 at 13-16, 18-20.

## STANDARD OF REVIEW

Federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1983). Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire,* 502 U.S. 62, 112 S. Ct. 475, 116 L.Ed.2d 385 (1991); *Lewis v. Jeffers,* 497 U.S. 764, 110 S. Ct. 3092, 111 L.Ed.2d 606 (1990); *Pulley v. Harris,* 465 U.S. 37, 41, 104 S. Ct. 871, 79 L.Ed.2d 29 (1984).

A federal court cannot grant a writ of habeas corpus to a state prisoner with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). State court decisions must be given the benefit of the doubt. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

A state court decision is "contrary to" the Supreme Court's "clearly established precedent if the state court applies a rule that contradicts the governing law set forth" in the Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and "nevertheless arrives at a result different from that precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams*, 529 U.S. at 405-06). "The 'unreasonable application' clause requires the state court decision to be more than incorrect

or erroneous." *Lockyer*, 538 U.S. at 75. That is, "[t]he state court's application of clearly established law must be objectively unreasonable." *Id.*

Under 28 U.S.C. § 2254(d)(2), a federal petition for writ of *habeas corpus* also may be granted "if a material factual finding of the state court reflects 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Juan H. v. Allen*, 408 F.3d 1262, 1270 n.8 (9th Cir. 2005) (9th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(2)). However, "[a] determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## DISCUSSION

**A.      Claim 1 – Removal of Counsel**

In his first ground for federal habeas relief, Mr. Riofta argues that he was unconstitutionally denied his right to counsel of his choice when the trial court disqualified his retained attorneys, Brett Purtzer and Lance Hester. ECF No. 5 at 13. Respondent argues that the claim is without merit because the trial court acted within the substantial latitude the Sixth Amendment accords trial judges to take appropriate measures to protect a defendant's right to representation by conflict-free counsel. ECF No.17 at 13.

In Mr. Riofta's case, the prosecutor moved to disqualify defense counsel on the ground that counsel's law firm (the Law Offices of Monte Hester) had a potential conflict of interest. One of Mr. Riofta's attorneys, Brett Purtzer, was representing Sarun Ngeth, one of the defendants in the multiple-homicide "Trang Dai case." The following conversation between the prosecutor and defense counsel summarizes the State's concerns and the nature of the possible conflict:

REPORT AND RECOMMENDATION - 9

The named victim in the case before the Court is Rhattna [sic] Sok. The conflict arises because Mr. Sok is the brother of the testifying codefendant in what are known as the Trang Dai cases, and I know when I make that reference, I believe the Court knows what cases I'm referring to.

The victim's brother is Veasna Sok, who at the time of this particular case, at the time of the assault on Rhattna [sic] Sok, Veasna Sok had been listed and was scheduled to testify in the Trang Dai murder cases.

The following investigation revealed that the defendant, Mr. Riofta, was friends with Sarun Ngeth, was familiar with the Trang Dai cases. Investigation showed that he had photographs from the newspaper of all of the Trang Dai defendants in his -- in one of the rooms in his house. He also made statements to officers regarding an assault which occurred on Veasna Sok. Mr. Sok was assaulted -- Mr. Sok, being Veasna Sok, was assaulted in one of the courtrooms or holding area of the courtroom. A few months after that his brother, here, was fired upon.

Mr. Purtzer represents Sarun Ngeth, who is one of the Trang Dai defendants. He is the Trang Dai defendant that this defendant knows the best. The concern that the State has is the obvious connection between the defendants here and the situation that it puts any attorney in, representing parties in both of these cases.

. . .

MR. PURTZER:       …At the time Mr. Riofta's case was filed, this case… there were three defendants that were going to trial in the Trang Dai case: Jimmie Chea, John Phet and Sarun Ngeth. Our office represents Sarun Ngeth.

Many months ago, there was an assault on Veasna Sok by Jimmie Chea and John Phet. They were charged with intimidation of material witness as a result of that assault on him.
…

He was, at that point in time, a testifying defendant that pled but was going to testify on behalf of the State. My client, Sarun Ngeth, had absolutely nothing to do with that, was not a part of that, and was no – of course was not charged as a result.

We started with motions in that Trang Dai case, and our client, Mr. Ngeth's case was severed from Jimmie Chea and John Phet.

MR. BENTON: After this case arose?

REPORT AND RECOMMENDATION - 10

1     MR. PURTZER: After this case arose. But one of the issues that was in it was this assault that occurred on Veasna Sok because it was not admissible in Mr.
2 Ngeth's case. That was one basis. There were several, but that was one.

3     The testimony, the proposed testimony of Veasna Sok is favorable to Mr.
4 Ngeth, with respect to placement in the vehicle and what was going on that particular evening. There is – it is our position that there's no conflict because
5 there is no connection, aside from the speculative connection between Mr. Riofta's case and Sarun Ngeth's case, in the Trang Dai events. That's the
6 position. At this point, Veasna Sok apparently has determined he's not testifying on behalf of the State.
7

8     MR. BENTON: Which of course raises further concern. Veasna Sok is in the position where he has been assaulted and his brother has been assaulted. At
9 the time of this assault, all three defendants, including Mr. Purtzer's client, were all joined. The situation has changed.
10

11     At this point, Mr. Phet and Mr. Chea's case is going to be continued. Mr. Sok's case is up in the air. It may well be, at some point, that that conflict doesn't
12 exist anymore, that they may all be rejoined, and these are things that may happen in the future. And I would disagree that Mr. Sok's testimony would be favorable
13 to Mr. Ngeth.

14     In speaking with the Trang Dai attorneys, [Veasna Sok] places [Sarun
15 Ngeth] at the scene of a major crime. He does provide testimony that ultimately would assist the State, in the State's position, in convicting his client, and the
16 position he puts himself in at this point -- and quite frankly, the mere fact that we're having this convoluted conversation demonstrates how these cases are
17 intertwined and the conflict that arises in this case. Given what appears to be an obvious connection, I make some sort of offer to this defendant who is facing, as
18 I've outlined, up to 183 months in prison if convicted, if I make some sort of offer to him that could impact the Trang Dai case, Mr. Purtzer cannot take that to Mr.
19 Riofta. And as part of an attorney's duty in taking any plea offer to a defendant, he has to be able to evaluate the offer, evaluate the case, advise his client as to the
20 strength of the case, the weakness of the case, and the decision whether or not to
21 accept this offer.

22     If that offer involves something that is contrary to the Trang Dai
23 defendants, he can't do that. It's an impossibility for him. He can't take it on to either client, and quite frankly, that puts both of these litigations in appellate
24 difficulty. As we all know, if a defendant is convicted, allegiance is changed, allegations are made that you should have seen this coming, this is an obvious
25 conflict, et cetera.

26 ECF No. 18, Exh. 2 at 3-4, 7-8.

REPORT AND RECOMMENDATION - 11

Defense counsel Mr. Purtzer opposed the State's motion to disqualify, arguing that the State's theory of a conflict of interest was speculative. *Id.* at 5-7, 9-13. There was no suggestion that Mr. Riofta and Sarun Ngeth would be willing to waive any conflict of interest. The trial court ultimately ordered that defense counsel were disqualified. *Id.* at 12-13. On appeal the Washington Court of Appeals affirmed the trial judge's ruling:

> The Trang Dai case was an ongoing, complicated, multi-party matter. The trial court knew that Riofta used to "hang out" with Ngeth. It also knew that Riofta had told the police that the victim's brother, Veasna Sok, deserved to be assaulted by the other Trang Dai defendants. The court knew that the police had searched Riofta's house and found a newspaper article with pictures of all the Trang Dai defendants. The prosecutor was saying that he intended to extend a plea offer in the hope of turning Riofta against the other Trang Dai defendants, including Ngeth. If Riofta were faced with such an offer, his interests would conflict with the interests of the other Trang Dai defendants, including Purtzer's client Ngeth. As neither Riofta nor Ngeth had offered to waive a conflict if one arose,[12] the trial court was being asked to predict the future without benefit of the hindsight that we presently enjoy.[13] Although a trial court should be *very* slow to disqualify counsel whom a defendant has chosen to retain, we cannot say that the trial court abused its discretion in this case.
>
> [12] "Trial courts may allow an attorney to proceed despite a conflict 'if the defendant makes a voluntary, knowing, and intelligent waiver.'" *State v. Dhaliwal*, 113 Wn. App. 226, 232, 53 P.3d 65 (2002), (citing *Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th Cir. 1994)), *review granted*, 148 Wn.2d 1009 (2003). As the test indicates, however, Riofta was not offering a waiver from himself or Ngeth. [Court's footnote.]
>
> [13] As the *Wheat* court aptly noted, a trial court
>> . . . must pass on the issue of whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.
>
> 486 U.S. at 162-63. [Court's footnote.]

ECF No. 18, Exh. 8 at 10-11.

The Sixth Amendment right to the assistance of counsel embraces the right to conflict-free counsel. *Wood v. Georgia*, 450 U.S. 261, 272, 101 S. Ct. 1097, 1103-04 (1981). A trial court that is alerted to the possibility of a conflict of interest has an affirmative duty to inquire about the conflict and to determine whether new counsel should be appointed. *Wheat v. United States*, 486 U.S. 153, 160, 108 S. Ct. 1692, 1697 (1988); *Cuyler v. Sullivan*, 446 U.S. 335, 346-48, 100 S. Ct. 1708, 1717 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 484-87, 98 S. Ct. 1173, 1178-80 (1978). A defendant who does not require the appointment of counsel for him has the right to choose who will represent him, and the erroneous denial of that right is a structural error not subject to harmless error analysis. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49, 126 S. Ct. 2557, 2564 (2006) (quoting *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792 (1963).

But while the right to counsel of choice is comprehended by the Sixth Amendment, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. at 159. Trial court judges who investigate potential conflicts of interest face the prospect of being "whip-sawed" by claims of error no matter which way they rule. *Wheat v. United States*, 486 U.S. at 161. A decision not to disqualify counsel may result in a later claim of ineffective assistance; a disqualification ruling, on the other hand, may result in a claim of denial of counsel of choice. *Id*. It is for these reasons that a trial court must be allowed "substantial latitude" to decide whether to disqualify counsel where a potential conflict exists that may or may not burgeon into an actual conflict as the trial progresses. *Id*. at 163. The presumption in favor of the defendant's counsel of choice may be overcome not only by an actual conflict but by a serious potential for conflict under the unique facts and circumstances of the case. *Id*. at 164.

REPORT AND RECOMMENDATION - 13

Mr. Riofta argues that the only potential conflict that existed in his case was a hypothetical one. "An attorney in Mr. Hester's law firm was defending a client, Sarun Ngeth, in a murder case that was tangentially – at most – connected with Mr. Riofta's case. There was no indication that Ngeth would be called to testify in Mr. Riofta's case." ECF No. 46 at 5. Mr. Riofta contends that, while there may have been some slight potential for a conflict facing Mr. Hester's law firm, that conflict would only have become real during Mr. Ngeth's case and there was no potential adverse impact on Mr. Riofta's case – Mr. Ngeth and Mr. Riofta were not co-defendants, the charges against them did not stem from the same conduct, and Ngeth was not likely to be called as a witness in Mr. Riofta's case. ECf No. 46 at 7. In other words, the State "manufactured" the conflict which prevented Mr. Riofta from being represented by his counsel of choice. *Id.* at 8.

Although there was not an actual conflict of interest, the trial judge is not required to wait until a possible conflict ripens into an actual one before concluding that counsel must withdraw from representation. In addition, there is no indication that defense counsel did anything to allay concerns about the potential conflict of interest nor did he refute the fact there was a potential conflict. ECF No. 18, Exh. 2 at 5-7, 9-13. Neither Mr. Riofta nor Sarun Ngeth, the "Trang Dai" defendant Mr. Purtzer's firm also represented, offered to waive any conflict of interest. *Id.*

Mr. Riofta also argues that subsequent facts show the dangers inherent in disqualifying his counsel of choice. After his counsel of choice was disqualified, his appointed counsel was replaced by a third counsel only a month later. His third counsel was replaced by a fourth the following month. Mr. Riofta replaced his fourth counsel with retained counsel two months later. That counsel failed to appear in court and then moved out of Washington and resigned from practice. Mr. Riofta was then assigned his sixth counsel, who had only three months to prepare

for trial.  ECF No. 46 at 9.  However, as noted in *Wheat,* the trial judge must pass on the issue of whether or not to allow a waiver of conflict of interest in the pretrial context *not* with the wisdom of hindsight.  *Id.* at 162-63.

The Washington Court of Appeals adjudicated Mr. Riofta's Sixth Amendment claim on direct appeal and applied the governing legal standard established in Supreme Court case law. ECF No. 18, Exh. 8 at 9-11.  Under *Wheat*, deference is given to the trial judge who has to decide issues of potential conflicts of interest.  Mr. Riofta has not shown that the Washington Court of Appeals' adjudication of his claim is either contrary to, nor an unreasonable application of, clearly established Supreme Court holdings governing this type of Sixth Amendment claim. Thus, the undersigned finds that Mr. Riofta is not entitled to federal habeas relief on this claim and it should be denied.

**B.      Claim 2 – Ineffective Assistance of Counsel**

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."  *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 2582 (1986).  A convicted defendant's claim of ineffective assistance of counsel is subject to a two-part analysis:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

*Strickland v. Washington*, 466 U.S. 678, 687, 104 S. Ct. 2052, 2064 (1984).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the

proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686.

In determining the adequacy of counsel's performance, the reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Therefore, the court "will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir.) (en banc), *cert. denied*, 511 U.S. 1119 (1994). In order to demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Unless the defendant's showing satisfies both the performance and prejudice prongs of this standard, the reviewing court has no basis for finding a Sixth Amendment violation. *Id*. at 687.14

The *Strickland* standard is "clearly established federal law" for purposes of AEDPA deference standard under 28 U.S.C. § 2254(d)(1). *Williams v. Taylor*, 529 U.S. 362, 391, 120 S. Ct. 1495, 1511, 146 L. Ed. 2d 389 (2000); *Weighall v. Middle*, 215 F.3d 1058, 1062-63 (9th Cir. 2000). *See also Furman v. Wood*, 190 F.3d 1002, 1008 (9th Cir. 1999). The Supreme Court has expressly eschewed per se, mechanical rules to resolve ineffectiveness claims because such rules would be inconsistent with Strickland's standard of reasonableness under all the circumstances. *Roe v. Ortega-Flores*, 528 U.S. 470, 479-81, 120 S. Ct. 1029, 1035-37 (2000). *Strickland* imposes a "highly demanding" standard upon petitioner to prove "gross incompetence". *Kimmelman v. Morrison*, 477 U.S. at 382. Judicial review of a defense attorney's performance is "doubly deferential when it is conducted through the lens of federal habeas." *Yarborough v. Gentry*, 540 U.S. 1, 6, 124 S. Ct. 1, 4 (2003).

REPORT AND RECOMMENDATION - 16

### (1)    Failure to Raise Issue of Incompetence to Stand Trial

Mr. Riofta claims that his trial counsel, E. Allen Walker, performed deficiently when he

failed to raise the issue of Mr. Riofta's competence. ECF No. 5 at 20. Mr. Riofta raised the

issue of his competency and his counsel's ineffectiveness in a motion to vacate. After a hearing,

the trial court denied the motion. ECF No. 18, Exh. 4 at 458-60. Mr. Riofta's appeal to the

Washington Court of Appeals was also denied. *State v. Riofta,* 118 Wash.App. 1025 (2003).

The Washington Court of Appeals' description of the events relating to Mr. Riofta's motion to

vacate provides useful background information for Mr. Riofta's federal claim on this issue:

> To support his motion to vacate, Riofta submitted a psychiatric report by
> Dr. Robert Olsen, M.D. After evaluating Riofta at McCloud's request, Dr. Olson
> [sic] had concluded that Riofta 'suffers from a severe psychiatric and neurologic
> defect that has and will continue to impair him into the indefinite future.' Dr.
> Olson [sic] did not opine that Riofta was incompetent at the time of trial.

> To further support his motion to vacate, Riofta submitted declarations
> from three of his former attorneys and a report from Geoffrey Loftus, an 'expert
> in human perception and memory.' (CP at 278-90) According to each of the
> attorneys, he or she had been concerned about competency and would have
> obtained a mental health evaluation if he or she remained in the case.
> According to Loftus, 'an expert witness in human perception and memory could
> have aided considerably in Mr. Riofta's defense, and that absent such an expert,
> the reliability of the fact-finder's conclusion is seriously undermined.' (CP at
> 278).

> On June 12, 2001, the trial court granted Riofta's motion that he be
> examined at Western State Hospital. After evaluating Riofta, Dr. Thomas
> Danner, Ph.D., and Dr. Hart reported that 'this individual does not have the
> capacity *at this time* to understand fully the nature of the legal proceedings against
> him or to assist in his own defense.' (CP at 395) (emphasis added by court)

> On August 1, 2001, the trial court granted the State's motion to commit
> Riofta to Western State Hospital to evaluate whether he was competent at the time
> of trial and until his present competency was restored. After further evaluating
> Riofta, Dr. Danner opined that Riofta suffered from bipolar and antisocial
> personality disorders; that it was not possible to determine whether Riofta had
> been incompetent at the earlier trial; and that Riofta was presently competent.
> With respect to incompetency at the earlier trial, Dr. Danner stated:

REPORT AND RECOMMENDATION - 17

> While it is not possible to describe his level of competency on his previously trial, … the defendant was aware of or able to recall the trial. As indicated above, he was aware of the length of time the jury was out and that he believed that he should have objected more. Mr. Riofta said that when he wanted to object, his attorney asked him, 'Where is the proof?' stating that there was no contrary proof or evidence. *As Mr. Riofta appears to have been aware of the process and involved during his trial*, though it is impossible without other information to speak with certainty as to his level of competency. (CP at 407) (emphasis added by court).

> With respect to present competency, Dr. Danner stated that Riofta 'has the capacity to understand the nature of the legal proceeding against him and to participate in the next stage of his trial.' (CP at 408).

> On December 14, 2001, the trial court held a hearing on Riofta's motion to vacate. Attorney Walker testified that while he was representing Riofta, he believed Riofta understood the nature of the charges and the role of counsel. They had discussed the charged events, legal theories, the potential for plea bargaining, witnesses, and discovery materials, and Walker had not formed 'any concerns about [Riofta's] ability to understand what was going on [.]' (RP at 410). Walker testified that he had not obtained an expert on eyewitness identification for two reasons: (1) because Sok was previously acquainted with Riofta; and (2) because if he did, the State would also, thus placing Riofta in a 'worse position.' (RP at 413-14) The trial court denied the motion to vacate, ruling that Riofta had been competent at trial and that Walker had provided effective assistance.

ECF No. 18, Exh. 8 at 7-9.

In rejecting Mr. Riofta's post-trial motion, the trial court expressly held that "the evidence is substantial that Mr. Riofta was competent at the time of trial in this case," and that his attorney was certainly "competent in how he handled that issue and Mr. Riofta's defense."

ECF No. 18, Exh. 4 at 457:

> What he [sic] have to look at are the behaviors that he presented with, what he did to assist in his own defense, how his attorney was able to communicate with him during the course of that defense, and whether Mr. Walker had a reasonable basis to believe that Mr. Riofta lacked competency in November of 2000.

REPORT AND RECOMMENDATION - 18

I think looking back at all of these factors and what occurred during this trial, I think that the evidence is substantial that Mr. Riofta was competent at the time of trial in this case.

..

It's clear that Mr. Riofta did communicate with his attorney, that he was able to assist in the preparation of certain defense strategies. I think Doctor Danner's report clearly indicates that Mr. Riofta has present memory as late as November of 2001 of doing just that. Participating in those discussions, of assisting in his defense, of fully understanding what Mr. Walker's role was as well as the role of the trial and the role of the prosecutor.

And I think there's been a [sic] substantial evidence presented that Mr. Walker was competent in his representation of Mr. Riofta on the question as to whether or not he should have advised or involved a psychologist or other mental health professional somehow in this defense team. I don't think, based upon everything that Mr. Riofta was showing by way of his participation, that any reasonable attorney would have felt the need to have a mental health professional become involved in Mr. Riofta's case at that time.

I think it's also borne out by the fact that there were Mr. Olbertz, Ms. Sullivan, Mr. Alton at one point, as well as Mr. Purtzer all involved in various times with this case, and none of them sought a competency evaluation at Western State Hospital or formal psychological assessment or evaluation by county designated mental health professional at any point. Nor did they do that in the ongoing case in Tacoma Municipal Court, in which Ms. Sullivan was handling that matter.

At no point did we have a request made to send Mr. Riofta out for evaluation. So I think with all of that in front of Mr. Walker, he certainly was, I think, competent in how he handled that issue and Mr. Riofta's defense.

ECF No. 18, Exh. 4 at 458-60.

The Washington Court of Appeals agreed that Mr. Walker did not provide ineffective assistance of counsel by not raising doubt about competency before trial:

Riofta first claims that Walker was ineffective by not raising doubt about competency before trial. Walker testified that he thought Riofta was competent to stand trial. The record does not show that he should have believed otherwise, notwithstanding the declarations of attorneys who themselves did not voice

REPORT AND RECOMMENDATION - 19

concern about competency until after the verdict. Riofta has not shown deficient performance because Walker failed to request [] competency hearing.[57]

[57] *In re Fleming,* 142 Wn.2d 853, is consistent with this result. In that case, defense counsel possessed two mental health reports before the defendant plead guilty. One report characterized the defendant as psychotic at the time of the crime and marginally competent to stand trial. *In re Fleming,* 142 Wn.2d at 858. The other report characterized the defendant as incompetent to stand trial. *In re Fleming,* 142 Wn.2d at 858. Here, there were no such reports before trial and, as the text discusses, Riofta has not shown that there should have been such reports before trial. [Court's footnote].

ECF No. 18, Exh. 8 at 17.

Here, Mr. Riofta argues that Mr. Walker knew that he was on medication for mental health problems, that he fixated on odd details, that he had a troubled upbringing and may have known about his *in utero* beatings and confinement to a mental health hospital as a child, and his commitment to a mental health facility at the age of 16. ECF No. 18, Exh. 4 at 421-24. In addition, Mr. Walker's conversation with a mental health professional at the jail showed some concern about his client's mental health. *Id.*

On the other hand, Respondent notes that Mr. Walker testified at the post-trial hearing that he had no reason to doubt his client's competency to stand trial. ECF No. 18, Exh. 4 at 414. Mr. Riofta understood the nature of the charges against him and that Mr. Walker was representing him. *Id.* at 409. Mr. Riofta was able to recall events and discuss them intelligently with counsel, as well as discussing the discovery materials, possible witnesses, and potential legal theories of the case. *Id.* at 409-12. Counsel also discussed the potential plea negotiations with Mr. Riofta. *Id.* at 410-11. During trial, counsel and Mr. Riofta talked about the witness testimony, Mr. Riofta often passing notes to counsel and suggesting the types of questions counsel could pose to them. *Id.* at 414-15. On September 8, 2000, Mr. Riofta received a phone call from Eileen Anderson, a mental health professional who worked at the jail. *Id.* at 416. Ms.

Anderson advised that she was working with Mr. Riofta on an unrelated misdemeanor assault case. *Id*. at 416, 418-19. Although Mr. Walker had no doubts about Mr. Riofta's competency, he asked Ms. Anderson whether she had any concerns about Mr. Riofta's competency to stand trial. *Id*. at 416. Ms. Anderson did not. *Id*.

Due process prohibits states from trying a person who is mentally incompetent. *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896 (1975). To be competent to stand trial, a defendant must demonstrate an ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him. *Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003). Defense counsel's failure to request a competency evaluation may violate the defendant's right to effective assistance of counsel provided there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency. *See e.g., Taylor v. Horn*, 504 F.3d 416, 438 (3rd Cir.2007).

According to the state court record, Mr. Riofta actively participated in his defense by communicating with his counsel. Defense counsel testified at length at the post-trial hearing that Mr. Riofta understood the nature of the charges against him, was able to recall relevant events and discuss them with counsel, and discussed potential legal theories with counsel. ECF No. 18, Exh. 4 at 409-10. Mr. Walker and Mr. Riofta discussed the discovery materials and witness reports (including the transcripts of interviews conducted by Mr. Riofta's prior attorneys). *Id*. at 411. Mr. Riofta also provided his counsel with the names of potential witnesses for counsel to interview. *Id*. at 412. During the course of trial, Mr. Riofta frequently consulted with counsel about the witnesses' testimony, passed notes to counsel, and suggested questions counsel could

pose to the witnesses. *Id*. at 414-15. Defense counsel had no concerns about Mr. Riofta's competency to stand trial. *Id*. at 412, 414, 416, 432-33, 434.

Based on its review of the state court record, this Court does not find that defense counsel's failure to request a competency evaluation violated Mr. Riofta's right to effective assistance of counsel because there is no indicia of incompetence such that an objectively reasonable counsel would have doubted Mr. Riofta's competency. Counsel's performance, therefore, fell within the wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 689. Mr. Riofta has not shown that the Washington Court of Appeals' adjudication of his claim is either contrary to, nor an unreasonable application of, clearly established Supreme Court holdings. Thus, the undersigned finds that Mr. Riofta is not entitled to federal habeas relief on this claim and it should be denied.

### (2) Failure to Cross-Examine Eyewitness and Obtain Expert Psychological Evaluation

Mr. Riofta next argues that Mr. Walker failed to adequately cross-examine the eyewitness Ratthana Sok and failed to obtain an expert on eyewitness identification, which would presumably, have assisted in cross-examining the eye-witness. ECF No. 5 at 16. He argues that when he obtained new counsel (Sheryl Gordon McCloud) after the verdict, she retained psychologist Prof. Geoffrey Loftus to evaluate eyewitness identification problems in the case and presented Dr. Loftus' report to the trial court as part of the motion to vacate. In that report, Dr. Loftus discusses scientific issues relating to how memory functions and the factors that may have biased the victim's identification of Mr. Riofta. *Id.*

Respondent argues that Mr. Riofta simply overlooks what his counsel did do. ECF No. 17 at 20. In his cross-examination of Sok, Mr. Walker elicited the fact that Sok's attention

became focused on the gun as soon as the shooter produced it.  ECF No. 18, Exh. 3 at 201.  He got Sok to admit that he could not really tell if the gunman had a shaved head or not because the gunman was wearing a hat.  *Id*. at 204-05.  Sok admitted on cross that he had seen Mr. Riofta near his house the day before the shooting.  *Id*. at 205.  Defense counsel's closing argument tied together Sok's cross-examination with the other evidence at trial bearing on the eyewitness testimony.  He argued that Sok mistakenly identified Mr. Riofta as the shooter because Sok had seen him walking around the neighborhood and simply speculated that it was Mr. Riofta.  *Id*. at 377, 381.  Counsel pointed out that Sok's description of facial hair varied and that Sok had told police the shooter was wearing a hat but also claimed that he was bald.  *Id*. at 379-81.  Mr. Walker argued that Sok's initial identification to police ("It looked like Alex") was tentative and evolved over time.  *Id*. at 377.  Counsel also made much of the fact that Sok had admitted he did not get a good look at the shooter's face and that his attention was actually focused on the gun, not on the person holding it.  *Id*. at 379, 383.

Nevertheless, Mr. Riofta insists eyewitness identification expert testimony should have been presented.  There is, however, no federal authority holding that such evidence must be allowed.  *Barker v. Fleming*, 423 F.3d 1085, 1089 n.1 (9th Cir. 2005); *Jordan v. Ducharme*, 983 F.2d 933, 938-39 (9th Cir. 1993); *United States v. George*, 975 F.2d 1431 (9th Cir.1992) (upholding the refusal to admit Dr. Loftus' testimony on reliability of eyewitness testimony); *United States v. Langford*, 802 F.2d 1176, 1179 (9th Cir.1986), *cert. denied*, 483 U.S. 1008, 107 S.Ct. 3235, 97 L.Ed.2d 740 (1987).  The decision to admit such evidence is left to the broad discretion of the trial judge.  The factors considered include whether cross-examination can expose any deficiencies in eyewitness testimony and whether the jury will benefit from the

1    evidence.  *Jordan,* 983 F.2d at 939 citing *United States v. Christophe*, 833 F.2d 1296, 1299 (9th

2    Cir.1987); *United States v. Amaral*, 488 F.2d 1148, 1153 (9th Cir.1973).

3         In Mr. Riofta's case, counsel chose not to call an expert witness and instead to challenge

4    Sok's identification through cross-examination.  ECF No. 18, Exh. 4 at 412-14.  The trial court

5    agreed that testimony by an expert would not necessarily have been helpful to the defense,

6    assuming it would have even been admissible.  *Id*. at 460-61; *see id*. at 460 (whether Dr. Loftus'

7    testimony would have been admitted is a "serious, serious question in this case.").  The

8    Washington Court of Appeals concluded that counsel's tactical decision was not deficient

9    performance under *Strickland*.   ECF No. 21 at 17-18.

10        Moreover, as noted by Respondent, an expert on eyewitness identification (such as Dr.

11   Loftus) was not necessary.  The jury did not need an expert to make them aware that a

12   misidentification would be possible if Sok was focused on the gun (rather than the gunman's

13   features), or the lighting was poor, or that Sok was thinking about Mr. Riofta because he had

14   seen him in the area recently.  These are facts the jury can weigh based upon their own

15   experience and knowledge.  Nor should it be taken as a given that Dr. Loftus' testimony would

16   have been admissible.  Washington appellate decisions have upheld the exclusion of expert

17   testimony concerning eyewitness identification as a proper exercise of discretion.  *See State v.*

18   *Cheatam*, 150 Wn.2d 626, 649-52, 81 P.3d 830 (2003)(upholding exclusion of Dr. Loftus'

19   testimony); *State v. Barker*, 103 Wn. App. 893, 14 P.3d 863 (2000); *State v. Hernandez*, 58 Wn.

20   App. 793, 794 P.2d 1327 (1990).

21        Mr. Riofta has not shown that the Washington Court of Appeals' adjudication of his

22   claim is either contrary to, nor an unreasonable application of, clearly established Supreme Court

REPORT AND RECOMMENDATION - 24

1  holdings.  Thus, the undersigned finds that Mr. Riofta is not entitled to federal habeas relief on

2  this claim and it should be denied.

3  **C.**     **Claim 3 – Photo Montage**

4          In his third claim for federal habeas relief, Mr. Riofta claims that he was the victim of an

5  overly suggestive identification procedure because the victim first told Detective Keen that the

6  suspect "looked like Alex" and then later told him that it "was Alex," the montage contained

7  individuals who were not Asian males, the montage contained pictures of men whose

8  appearances differed dramatically from one another, and the officers failed to give standard

9  warnings to the victim before he viewed the montage.  ECF No. 5 at 19.

10          The Due Process Clause of the Fourteenth Amendment protects an individual from

11  conviction based on identification procedures that are improperly suggestive.  *Baker v.*

12  *McCollan*, 443 U.S. 137, 152 (1979).  Accordingly, it is a recognized ground of attack upon a

13  criminal conviction that the pretrial identification procedure in the defendant's case "was so

14  unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied

15  due process." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967).  However, the Due Process Clause

16  does not compel the exclusion of all out-of-court suggestive identifications.  *Manson v.*

17  *Brathwaite*, 432 U.S. 98, 109-14 (1977).  Rather, "[i]n a criminal trial, the Due Process Clause

18  requires the exclusion of evidence obtained through procedures presenting a very substantial

19  likelihood of . . . misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).  It is

20  the likelihood of misidentification that violates a defendant's right to due process.  *Neil v.*

21  *Biggers*, 409 U.S. 188, 198 (1972).   "Reliability is the linchpin in determining the admissibility

22  of identification testimony ...." *Manson v. Brathwaite*, 432 U.S. at 114.

REPORT AND RECOMMENDATION - 25

The reviewing court must apply a two-part test, first determining whether the challenged encounter was impermissibly suggestive, and second, examining the totality of circumstances to decide whether the witness' in-court identification is nonetheless reliable despite the suggestiveness of the confrontation procedure. *Neil v. Biggers*, 409 U.S. at 198-99; *Ponce v. Cupp*, 735 F.2d 333, 336 (9th Cir. 1984). The factors to be considered in assessing the reliability of a witness identification include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. at 199-200.

A state court's findings of fact, applicable to this mixed question of fact and law, determined after a full, fair, and adequate hearing, are entitled to a statutory presumption of correctness. 28 U.S.C. § 2254(e)(1); *Sumner v. Mata*, 455 U.S. 591, 597 (1982). Thus, trial court findings regarding "whether the witnesses in [the] case had an opportunity to observe the crime or were too distracted; whether the witnesses gave a detailed, accurate description; and whether the witnesses were under pressure from prison officials or others are all questions of fact to which the statutory presumption applies." *Sumner v. Mata*, 455 U.S. at 597.

If the identification fails both parts of the due process analysis (*i.e.,* one that results from a suggestive procedure and is unreliable), the remedy is exclusion of any in-court identification based upon the prior identification as well as evidence of the prior identification itself. *Foster v. California*, 394 U.S. 440, 442-43 n.2 (1969). However, if the evidence is admissible as a matter of law, its reliability is a question of fact to be resolved by the trier of fact. *Manson v.*

*Brathwaite*, 432 U.S. at 116-17 ("evidence of some untrustworthiness is customary grist for the jury mill"); *see also Watkins v. Sowders,* 449 U.S. 341, 347-48 (1981).

Under Washington law, evidence of an extrajudicial identification of a person is admissible as nonhearsay substantive evidence. *See* Wash. R. Evid. 801(d)(1)(iii); *State v. Simmons*, 63 Wn.2d 17, 385 P.2d 389 (1963). *Cf.* Fed. R. Evid. 801(d)(1)(C); *United States v. Jarrad*, 754 F.2d 1451, 1456 (9th Cir. 1985).

In Mr. Riofta's case, Ratthana Sok immediately recognized the shooter as "Alex", a person he had known for years. ECF No. 18, Exh. 3 at 186. Sok testified that he got a "good look" at the shooter's face in his driveway. *Id*. at 189, 201, 211. The driveway was well-lit by a floodlight on top of the garage and a nearby streetlight. *Id*. at 189. The shooter walked up to within a few feet of Sok and spoke to Sok in a voice that was familiar to him. *Id*. at 182-83. Mr. Riofta was the only person Sok was speaking to at that time. Shortly after the shooting Sok told police that "Alex" had shot him. ECF No. 18, Exh. 3 at 199-201. The physical description Sok gave to the police was of a 17-18 year old Cambodian male named Alex, 5"2" to 5"3" in height, weighing approximately 125-130 lbs., with a shaved head and moustache, was a very accurate description of Mr. Riofta. *See id*. at 258 (Mr. Riofta was 5'2", 125 lbs., 22 years old with a moustache and shaved head). Sok was certain of his identification of "Alex" from the several photos Detective Davidson presented him. When he viewed the photo of Mr. Riofta he told Detective Davidson, "That's him right there, I'm positive." *Id*. at 249.

The Washington Court of Appeals reviewed the merits of this claim under the appropriate federal constitutional standard and held that Mr. Riofta had failed to show a substantial likelihood of irreparable misidentification:

REPORT AND RECOMMENDATION - 27

Assuming without holding that the montage was suggestive, it did not "give rise to a substantial likelihood of irreparable misidentification."[19] Relevant factors include the witness's "opportunity to view the suspect, the degree of attention, the accuracy of the witness's prior description, the level of certainty demonstrated at the identification, and the time span of the identification."[20] Sok saw the shooter approach and immediately recognized him as "Alex." Sok was acquainted with "Alex" from the playground and because Alex had visited Veasna at the Sok home. Sok gave the police a detailed description that closely matched Riofta's appearance: "Cambodian male, 17 to 18 years of age, five-two to five-three, 125 to 130 pounds, with a shaved head and a moustache."[21] When Sok saw Riofta's picture, he blurted, "That's him right there, I'm positive."[22] In light of these circumstances, the record does not show a substantial likelihood of irreparable misidentification.

[19] *State v. Vickers*, 148 Wn.2d 91, 118, 59 P.3d 58 (2002. [Court's footnote.] [20] *State v. Booth*, 36 Wn. App. 66, 70, 671 P.2d 1218 (1983)(citing *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)); *State v. Burrell*, 28 Wn. App. 606, 610, 625 P.2d 726 (1981). [Court's footnote.]
[21] RP at 246. [Court's footnote.]
[22] RP at 249. [Court's footnoe.]

Exhibit 8, at 13-14.

The standard of review relied upon by the Washington Court of Appeals (*State v. Vickers, supra*) is expressly based upon *Neil v. Biggers, Manson v. Brathwaite*, and *Simmons v. United States. See Vickers*, 148 Wn.2d at 91 & n.80. The Washington appellate court viewed the eyewitness' opportunity to view the suspect, the degree of attention that was paid to the suspect, the accuracy of his prior description, the level of certainty in the identification and the time span of the identification. The court noted that the eyewitness immediately recognized Mr. Riofta, was previously acquainted with him from the playground and from visits at his home, and gave a detailed description closely matching Mr. Riofta's description. When Sok saw Mr. Riofta's picture, he blurted, "That's him right there, I'm positive."

The Washington Court of Appeals' decision on this claim was neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court holdings.

REPORT AND RECOMMENDATION - 28

Therefore, the state court's decision is entitled to deference under 28 U.S.C. § 2254(d)(1). Mr. Riofta is not entitled to federal habeas relief and this claim should be denied.

**D.      Claim 4 – Incompetency to Stand Trial**

In his fourth ground for federal habeas relief Mr. Riofta argues that he was incompetent at the time of trial. ECF No. 5 at 20. He raised this issue in a post-trial motion to vacate, but the trial court denied the motion and relief was denied on appeal. *Id.* Mr. Riofta argues that the trial court failed to take into account the uncontroverted evidence of Mr. Riofta's history of mental health problems, which included "credible diagnoses of paranoid disorder, attention deficit disorder, developmental disorder of childhood, anxiety disorder, and possible schizophreniform disorder." ECF No. 46 at 20. Respondent argues that there was nothing before the trial court at the time of trial that would have caused a reasonable judge to seriously doubt Mr. Riofta's competency and the trial court reliably found in the post-trial proceedings, that Mr. Riofta was, in fact, competent during trial.

It is well settled that the conviction of a criminal defendant who is legally incompetent to stand trial is a violation of constitutional due process. *Godinez v. Moran*, 509 U.S. 389, 396, 113 S. Ct. 2680, 2685 (1993); *Drope v. Missouri*, 420 U.S. 162, 172-73, 95 S. Ct. 896, 904 (1975); *Pate v. Robinson*, 383 U.S. 375, 386, 86 S. Ct. 836, 842 (1966). The standard for determining competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 789 (1960) (per curiam). If a defendant is incompetent, due process requires that the criminal proceedings be suspended until such time that the defendant regains his competency. *Medina v. California*, 505 U.S. 437, 448, 112 S. Ct. 2572, 2579 (1992).

State courts are constitutionally obligated to employ procedures adequate to protect against the trial of an incompetent defendant, and a court's failure to observe those procedures is a violation of the defendant's due process right to a fair trial. *Drope v. Missouri*, 420 U.S. at 172; *Pate v. Robinson*, 383 U.S. at 386-87. However, a competency hearing is not required absent a "bona fide" doubt regarding the defendant's competency. *Pate v. Robinson*, 383 U.S. at 385; *Williams v. Woodford*, 384 F.3d 567, 603-04 (9th Cir. 2004); *Hernandez v. Ylst*, 930 F.2d 714, 716 & n.3 (9th Cir. 1991); *de Kaplany v. Enomoto*, 540 F.2d 975, 979-83 (9th Cir. 1976)(en banc), *cert. denied*, 429 U.S. 1075 (1977).

The question to be answered by the reviewing court is whether a reasonable judge, situated as the trial court judge in the proceedings under review, should have entertained a genuine or substantial doubt regarding the defendant's competency to proceed. *Williams*, 384 F.3d at 604; *Hernandez*, 930 F.2d at 716-18; *de Kaplany*, 540 F.2d at 983. "There are. . .no fixed or immutable signs which invariably indicate the need for further inquiry." *Drope*, 420 U.S. at 180. The reviewing court must assess a variety of objective factors, such as the defendant's in-court and out-of-court conduct, any psychiatric evidence or testimony, the statements of the attorneys, and any other information properly before the trial court. *Williams*, 384 F.3d at 604-07; *Hernandez*, 930 F.2d at 717-18.

The opinion of the defendant's attorney that his client is competent is often the most significant information, because "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." *Medina*, 505 U.S. at 450; *see also Hernandez*, 930 F.2d at 718. A state court finding that the defendant was competent to stand trial is a finding of fact, entitled to a presumption of correctness. *Maggio v. Fulford*, 462 U.S. 111, 117, 103 S. Ct. 2261, 2264, 76 L. Ed. 2d 794 (1983); *Langford v. Day*, 110 F.3d 1380, 1390-91 (9th Cir.

REPORT AND RECOMMENDATION - 30

1996); *King v. Brown*, 8 F.3d 1403, 1408 (9th Cir. 1993); *Brewer v. Lewis*, 989 F.2d 1021, 1030 (9th Cir. 1993); *Evans v. Raines*, 800 F.2d 884, 887 (9th Cir. 1986). To obtain relief under AEDPA, the petitioner must rebut this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

During the post-trial proceeding, the trial court found that Mr. Riofta was competent during trial:

> I think throughout the time period of Mr. Walker's representation in August, it's clear that Mr. Riofta participated in the defense; participated in interviews; participated in discussions both pretrial and also during the trial. And as Doctor Danner pointed out in his report, it's impossible for us to have an ability to look backwards and say with any degree of specificity that Mr. Riofta was not competent in November of 2000.

> What he [sic] have to look at are the behaviors that he presented with, what he did to assist in his own defense, how his attorney was able to communicate with him during the course of that defense, and whether Mr. Walker had a reasonable basis to believe that Mr. Riofta lacked competency in November of 2000.

> I think looking back at all of those factors and what occurred during this trial, I think that the evidence is substantial that Mr. Riofta was competent at the time of trial in this case.

> . . .

> I think the first portion of that argument as to regarding the psychological testing really I have addressed in part I think based upon everything that Mr. Riofta was doing from the time period of August through November of 2000 and participating in the defense and discussing alibis and discussing potential witnesses, in sitting through the trial, and also sitting through the 3.5 and 3.6 hearings. It's clear that Mr. Riofta did communicate with his attorney, that he was able to assist in the preparation of certain defense strategies. I think Doctor Danner's report clearly indicates that Mr. Riofta has present memory as late as November of 2001 of doing just that. Participating in those discussions, of assisting in his defense, of fully understanding what Mr. Walker's role was as well as the role of the trial and the role of the prosecutor.

> And I think there's been a substantial evidence presented that Mr. Walker was competent in his representation of Mr. Riofta on the question as to whether or

REPORT AND RECOMMENDATION - 31

not he should have advised or involved a psychologist or other mental health professional somehow in this defense team. I don't think, based upon everything that Mr. Riofta was showing by way of his participation, that any reasonable attorney would have felt the need to have a mental health professional become involved in Mr. Riofta's case at that time.

I think it's also borne out by the fact that there were Mr. Olbertz, Ms. Sullivan, Mr. Alton at one point, as well as Mr. Purtzer all involved in various times with this case, and none of them sought a competency evaluation at Western State Hospital or formal psychological assessment or evaluation by county designated mental health professional at any point. Nor did they do that in the ongoing case in Tacoma Municipal Court, in which Ms. Sullivan was handling that matter.

At no point did we have a request made to send Mr. Riofta out for evaluation. So I think with all of that in front of Mr. Walker, he certainly was, I think, competent in how he handled that issue and Mr. Riofta's defense.

Exhibit 4, at 457-60.

The Washington Court of Appeals affirmed the superior court's ruling as to the

procedural due process and substantive due process issues:

The next issue concerns Riofta's competency to stand trial. Riofta argues (A) that he was denied his right to a competency hearing, and (B) that he was incompetent at trial. RCW 10.77.050 provides that "[n]o incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues." The federal due process clause is in accord.[44]

A.

Based on his right to procedural due process, Riofta contends that the trial court erred by not holding a competency hearing before trial. A competency hearing is required "[w]henever …there is reason to doubt [a defendant's] competency[.]"[45] "There are no fixed signs which invariably require a hearing, but the factors to be considered include … a defendant's irrational behavior, his demeanor, medical opinions on competence and the opinion of defense counsel."[46] When the court has reason to doubt competency, it must order a competency examination.[47]

To show that the trial court had reason to doubt his competency before trial, Riofta points to the evaluations done by Dr. Danner and Dr. Olsen *after* trial, as well as to the affidavits submitted by his former attorneys *after* trial. The record does not show, however that the information in any of these materials was

REPORT AND RECOMMENDATION - 32

made known to the trial court before or during trial. Nor does the record indicate that Riofta's demeanor in open court was bizarre enough to require an inquiry into competency.[48]  In sum, the record does not show that the trial court had reason to doubt competency before trial or that the trial court should have held a hearing before trial.

B.

Based on his right to substantive due process, Riofta argues that the trial court erred by trying and convicting him while he was incompetent.  A defendant has a due process right not to be tried and convicted while incompetent.[49]  He or she is incompetent if he or she "lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect."[50]

After a post-trial hearing, the trial court ruled that Riofta had been competent at trial.  It relied on its own observations, on opinions from Dr. Danner and Dr. Olson, and on opinions from Riofta's former counsel.  It noted that Riofta had "participated in the defense; participated in interviews; participated in discussions both pretrial and also during the trial.[51]  It noted that Dr. Danner had said he could not "look backwards and say with any degree of specificity that Mr. Riofta was not competent in November of 2000."[52]  It had read Dr. Danner's comment that Riofta was "aware of the process and involved during his trial[.]"[53]  It had heard Walker's testimony that Riofta appeared to understand the nature of the charges; that Riofta seemed to have a reasonable recollection of events; and that Riofta had assisted in his defense by discussing potential plea bargains, witnesses, and discovery.  Despite the contrary suggestions from other attorneys, the record the trial court considered amply supported its finding that Riofta had been competent during trial.

---

[44] *Pate v. Robinson,* 383 U.S. 375, 385, 86 S.Ct. 836, 15 L. Ed. 2d 815 (1966).

[45] RCW 10.77.060 (1)(a).

[46] *State v. O'Neal,* 23 Wn. Ap. 899, 902, 600 P.2d 570, *review denied,* 93 Wn.2d 1002 (1979).

[47] *City of Seattle v. Gordon,* 39 Wn. App. 437, 441, 693 P.2d 741, *review denied,* 103 Wn.2d 1031 (1985).

[48] *Compare State v. Lord,*  117 Wn.2d 829, 901, 822 P.2d 177 (1991), *cert. denied,* 506 U.S. 856 (1992) (no error in not delving into competency even though defendant told court "he had a conversation with the Lord and the devil and the devil asked him to drink a cup of his own blood to prove his innocence").

[49] *Drope v. Missouri,* 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *Pate,* 383 U.S. at 385; *In re Personal Restraint of Fleming,* 142 Wn.2d 853, 863, 16 P.3d 610 (2001) (citing *O'Neal,* 23 Wn. App. at 901).

[50] RCW 10.77.010(14); *In re Fleming,* 142 Wn.2d at 862.

[51] RP at 457.

[52] RP at 457.
[53] CP at 407.

ECF No. 18, Exh. 8 at 14-16:

In its opinion, the appellate court expressly relied upon the relevant federal constitutional standard set forth in *Pate v. Robinson*, and *Drope v. Missouri*. The state court's findings with regard to Mr. Riofta's competency during trial are a reasonable determination of the facts in light of the evidence for purposes of 28 U.S.C. § 2254(d)(2) and are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). Moreover, the Court of Appeals' resolution of the merits of Mr. Riofta's competency claims were neither contrary to, nor an unreasonable application of, clearly established federal law governing these due process issues. Thus, Mr. Riofta is not entitled to relief on this habeas claim and it should be denied.

## CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard and based on a thorough review of the record and analysis of the law in this case, this Court concludes that Mr. Riofta is not entitled to a certificate of appealability with respect to this petition.

REPORT AND RECOMMENDATION - 34

## CONCLUSION

Based on the foregoing discussion, the undersigned recommends that Mr. Riofta's habeas petition be **denied**, and this action **dismissed with prejudice**.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **December 16, 2011**, as noted in the caption.

**DATED** this __30th__ day of November, 2011.

Karen L. Strombom
United States Magistrate Judge